MaddeN, Judge,
delivered the opinion of the court:
This is a suit by the plaintiff League of Women Voters for the refund of estate taxes. The League was the residuary legatee under the will of Ann Webster, a resident of New Mexico, who died in 1949. The total gross estate was $142,-014.22. The residue, after deducting the specific bequests, was $112,269.89. The estate was required to pay a Federal estate tax of $11,913.70, all of which was paid out of the residue of $112,269.89 and therefore reduced the gift to the League by the amount of the tax.
The plaintiff says that the bequest to it should have been allowed as a deduction from the gross estate, for estate tax purposes. If such a deduction had been allowed, no estate tax would have been payable, and the plaintiff would have- *563 received $11,913.70 more than it did receive. The plaintiff relies upon section 812 of the Internal Kevenue Code of 1989, which says, so far as is here pertinent:
Sec. 812. Net estate.
For the purpose of the tax the valne of the net estate shall be determined, in the case of" a citizen or resident of the United States by deducting from the value of the gross estate—
(d) Transfers for Public, Charitable, and Religious Uses. — The amount of all bequests, lagacies, devises, or transfers, to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation, * * *. (26 U.S.C. 1952 ed., Sec. 812.)
The plaintiff says that it is operated for educational purposes, and is therefore within the scope of section 812(d). The Government seems to dispute this contention, but we have no doubt about it, as will appear from our discussion. The real point in contest is with regard to the requirement of section 812(d) that no substantial part of the activities of the-organization should be the carrying on of propaganda or otherwise attempting to influence legislation.
The plaintiff League is a non-profit organization: It was projected at the 1919 convention of the National American Woman Suffrage Association whose work for women’s suffrage had by that time been completed by the adoption of .-the Nineteenth Amendment. The League had its first convention in 1920. It was then an affiliation of state leagues. In 1923 it was incorporated under the. laws of the District of Columbia relating to -non-profit, charitable, educational and religious corporations. Its principal office is in Washington, D.Q. Its .articles of incorporation provide':
The business and objects of the corporation shall be to promote political responsibility through informed and active participation of citizens in government; to'render *564 such other services in the interest of education in citizenship as may be possible; and to do every act appropriate or necessary to carry out any of the foregoing objects.
The corporation shall not support or oppose any political party or candidate.
Its by-laws provide:
Seo. 1. Purpose. — The purpose of the League of Women Voters of the United States shall be to promote political responsibility through informed and active participation of citizens in government.
Sec. 2. Policy. — The League may take action on governmental measures and policies in the public interest. It shall not support or oppose any political party or candidate.
The League, in the tax year here in question, was made up of 709 local Leagues, and 35 state Leagues, all heading up in the national organization. Approximately 128,000 women were members of the League. Its organization and method of operation are described in great detail in our findings, and will be described only summarily in this opinion.
The League has developed a program system which is designed to limit the number of problems to be currently studied or acted upon by the League. The program is authorized by the League’s biennial national convention. The individual members and their representatives make the program by discussing in their local League what they think the program should be, after which the local Leagues make recommendations to the national board of subjects for the program. State boards also submit recommendations. The national board meets some months before the convention and works out a “proposed program.” It submits this proposed program to the local and state Leagues, which have six months to study and consider it, and may again submit recommendations. In the light of all this study, discussion and recommendation the national board presents a final proposed program to the convention. If the convention adopts it, which it usually does, it becomes the program of the League.
The program consists of the “current agenda”, the topics on which the League believes it can be effective during the *565 following two years, and the “platform” which comprises topics on which the League has taken a stand in the past and on which it proposes to hold its ground although these topics may not be currently in question.
After the national biennial convention of the League in 1949, the League’s official publication made the following statement:
The current agenda is made up of those governmental issues which the Convention has chosen for concerted action. Action may include (1) providing information, (2) building public opinion, (3) supporting legislation. It is the responsibility of the National Board of Directors to supply the membership with basic information on these items and to determine at a specific time the action that will be most effective in achieving the following goals:
CURRENT AGENDA
The League of Women Voters will work for United States policies directed toward an enduring world peace, supported by a strong United Nations and made possible by a sound domestic and world economy. To this end, League action will concentrate on:
I. Strengthening the United Nations through—
A. Support of the United Nations and its specialized agencies including their development through increased use, adequate budgets, and improved procedures under the present Charter.
B. Use of all means available under the Charter to increase the security functions of the United Nations.
C. A full information program on methods to strengthen the United Nations in order that it may better fulfill its stated purpose.
II. Promoting international reconstruction and the expansion of world trade.
III. Analyzing federal taxes and expenditures in order to understand and support such fiscal policies as malee for a stable domestic economy.
The official League publication then went on to give a detailed explanation of the “Current Agenda.” This explanation shows that it was the intention of the League to take vigorous action to achieve its goals. We see no way in which most of those goals could be achieved except by *566 legislation by Congress, or by tlie United Nations, or by international treaties.
It was not the purpose of the League merely to make its members, or the public, intelligent about the problems of the United Nations and the expansion of its powers to enforce world security, or about the Marshall plan and international trade organizations and reciprocal trade. It was its purpose, through its membership and its officials, to do what it could to influence those who were in a position to bring about these results, if they could be persuaded to do so.
In an official League publication, entitled “A History of the League Program” published in 1949, appears the following:
LEAGUE PROGRAM AND LEAGUE PURPOSE
Sometimes the League of Women Voters is referred to as an “educational” organization which presents both sides of issues and leaves it up to the member to make up her mind. This is an incomplete description. Although the League does carefully consider a question from all points of view, it goes farther. It uses its own machinery of representative government to arrive at a position and take action on behalf of that position. This it considers necessary to the fulfillment of its purpose “to promote political responsibility through informed and active participation of citizens in government.” Citizens do not assume responsibility without making decisions. The League was created to provide practice in making decisions.
■ As we have seen, one form of League action is that of supporting legislation. This form of action may include a “Request for Action” to the state and local Leagues, setting forth the League’s position on any pending legislation and requesting that each state and local League write letters or send telegrams to designated persons setting forth the League’s position. For instance, a “Request for Action” was sent on May 17, 1949, urging action on five bills and the Atlantic Pact Treaty. Typical was the action urged with respect to the item “Removal of Margarine Taxes (H.R. 2023)”, as follows:
Already passed by the House and favorably reported by the Senate Committee, this measure runs the risk of being lost again in the rush of Senate business. Letters *567 should go now to all Senators (and especially to Democratic leaders Barkley, Lucas and Myers) urging them (1) to do all they can to bring this bill to the Senate floor before the summer recess, and (2) to oppose the Wiley amendment which would prohibit the interstate shipment of colored oleo.
Communications are also sent advising the local Leagues concerning positions taken, such as the letter dated May 2, 1949, stating:
This letter brings you word that the League of Women Voters supports United States ratification of the North Atlantic Pact. * * * A League representative will testify before the Senate Foreign Delations Committee on behalf of the Pact. You may expect a Bequest for Action when League action can be most helpful.
Our finding 22(g) lists twenty-two separate instances of direct communications from the national League or its officials to persons in positions of authority with regard to legislation. These instances occurred during the two-year period of action planned at the League’s 1948 convention.
The activities of the state and local Leagues in connection with state and local problems are carried on in much the same way, in their more limited areas, as are those of the League as a whole in connection with national problems.
The local Leagues carry on many activities which have no relation to influencing legislation. They sponsor meetings at which candidates of all parties, or proponents and opponents of measures present their arguments. They urge those eligible to vote to exercise their privilege. They sometimes distribute literature stating the arguments for and against positions and measures, but not taking a position on either side.
The plaintiff League urges that only an insignificant part of its energies and resources are devoted to efforts to influence legislation. It has presented an accounting, attributing the woman hours devoted to League activities to various classifications, and attributing very few such hours to efforts to influence legislation.
It seems to us that the hours spent by some 128,000 women in more than 700 local Leagues, deliberating and discussing what position, if any, should be taken on questions of public *568 interest, are spent in preparation for the influencing of legislation. They are spent for the purpose of presenting a united front to legislative bodies in order to induce action or inaction. When agreement has been reached on a national scale and the League’s convention has stated the League’s program, it seems to us that all the action of all the women of the League from that time forward is taken for the purpose of influencing legislation. They are studying the League’s literature, learning how to argue effectively for the League’s position, readying themselves to respond to the “Request for Action” if it should come from their national officers.
It would seem to us that, instead of its being an unsubstantial and insignificant part of the League’s activities, the influencing of legislation is the League’s main purpose and reason for being. When the mantle of the National American Woman Suffrage Association descended upon it at its birth, it could hardly have thought of itself as an institution devoted to pure and purposeless research and self-education. As we have said, we have no doubt of the League’s status as an educational organization. The education of public-spirited women so that they may, by their agreed opinion deliberately and intelligently arrived at, influence legislators or influence others to influence legislators to reach right decisions, is education of the most useful and laudable kind. But. a gift to such an educational institution cannot qualify for a tax deduction under section 812.
The plaintiff’s petition will be dismissed.
It is so ordered.
Laramore, Judge, and Whitaker, Judge, concur.